## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cr-20204-JTF |
| | ) | |
| CLAIBON BURRUS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Claibon Burrus's Motion to Suppress, filed December 22, 2022.  (ECF No. 40.)  District Judge John T. Fowlkes, Jr., referred the motion to the undersigned for report and recommendation.  (ECF No. 43.)  The United States responded in opposition on January 5, 2023.  (ECF No. 41.)  The Court held a hearing on February 9, 2023.[1]  (ECF No. 48.) Based on the statements of counsel and the entire record in this case, the Court recommends that the motion be denied.

## PROPOSED FINDINGS OF FACT

On October 10, 2021, Sergeant Jonathan Overly with the Memphis Police Department ("MPD") applied for a warrant to search the premises at 3038 Brookdale Street, Memphis, Tennessee 38118, by completing and executing, under oath, an affidavit for a search warrant. (ECF No. 41-1.)  As grounds for issuance of the search warrant, Sergeant Overly indicated that he was assigned to the Heroin Opioid Response Team of the MPD's Organized Crime Unit and

---

[1] The hearing was limited to oral argument, with no evidence submitted.

was responsible for investigating drug overdoses.  He had received specialized education and training in the investigation and detection of illegal drug activity, had been a police officer since 2003, and had "participated in numerous drug arrests, drug seizures, and drug and overdose death investigations."  (*Id.* at 3.)

Sergeant Overly described the investigation into a possible drug overdose by Jessica Oldaker, who was found deceased in a bathtub in her home on December 2, 2020.  (*Id.*)  On the toilet next to her were two small plastic bags containing 1.2 grams total weight of fentanyl and "drug use paraphernalia."  A confidential source told investigators that Oldaker routinely bought heroin from "Yai," a bald, Black male "always wearing a ball cap, medium build, late 40's, 5'10" to 5'11"."  Yai was known to sell heroin and cocaine using multiple telephone numbers, including 901-491-7846.  The confidential source indicated that Yai lived and stored narcotics at 3038 Brookdale Drive and drove a black Mercedes S series and a silver four-door Infiniti with a Tennessee license plate bearing the number 2DA559.  Yai met his narcotics customers at several locations on Perkins Road, particularly including a McDonald's and a Marathon gas station.  The confidential source had seen Yai on several occasions meet with other individuals and exchange cash for narcotics at those locations.  Sometimes, Yai would send his wife (described as a Black female, 5'6", with straight hair who was known to sell methamphetamine and crack cocaine), his son, or his nephew (both possibly in their 20s) to "serve" these individuals.  The affidavit notes that two telephone numbers used by Oldaker were in contact with Yai.

Investigators then obtained a search warrant for records associated with 901-491-7846.  The subscriber was "Boyia Burrus."  (*Id.*)  One of the most frequent incoming callers was a number attributed to Stephanie Sides, who was found unresponsive behind the wheel of her car in September 2020 and in possession of cocaine and alprazolam.  Sides has a history of petty

2

theft and a drug paraphernalia arrest.  Another contact was a number attributed to Jennifer

Trotter, who was arrested in June 2019 with methamphetamine, fentanyl, and various pills.  Two

other "top" callers were numbers attributed to Clint Richardson and Rodrick Taylor, both of

whom have histories of possessing felony amounts of crack cocaine.

      Another member of the Organized Crime Unit, Detective Atkins, determined that the

current utility holder for 3038 Brookdale was Cindy Jones.  (*Id.*)  Investigators learned that Jones

had an active warrant for aggravated assault and was in a relationship with Claibon Burrus.  For

example, Burrus was the target of a search warrant in 2012, where heroin, cocaine, and crack

cocaine were found, and Jones was present at the execution of the warrant.  The confidential

source identified Burrus and Jones as "the individuals which were described at 3038 Brookdale

Street."

      On January 11, 2021, Sergeant Overly and Detective Atkins surveilled 3038 Brookdale

and saw Burrus leave in a silver Infiniti with a license plate matching the one described by the

confidential source.  (*Id.* at 3–4.)  Burrus met with sanitation workers who were collecting trash

on the street.  (*Id.* at 4.)  Investigators saw him hand one of the workers an unknown object and

noted that the trash can at 3038 Brookdale was on the curb and had not yet been collected.  They

followed the Infiniti to a laundromat on the corner of Knight Arnold and Perkins, where they saw

Burrus meet with an individual, who had been "loitering on the front of the lot in the snow,"

through the passenger window of the Infiniti.  Burrus left the laundromat, drove to the Marathon

gas station, parked at a pump for eight minutes, and then met with two white males in a red

GMC Sierra truck.  The passenger of the truck met Burrus at the driver's window and quickly

left.  Burrus left the Marathon, turned back into the neighborhood where 3038 Brookdale is

located, doubled back, and then "took a roundabout direction to return to 3038 Brookdale

travelling at a very slow speed." The affidavit notes that these activities are indicative of drug trafficking and that "slow travel and multiple turns after the narcotics transactions are routinely done by narcotics traffickers to see if they are being followed by law enforcement."

During additional surveillance of 3038 Brookdale on January 13, 2021, investigators saw the Infiniti at the house and watched a white Nissan Maxima arrive. (*Id.*) A younger, Black male went in the house, stayed about fifteen minutes, and left. Investigators followed him, describing his driving as erratic and at excessive speeds, before watching him meet an individual at a house on Clearbrook and then losing him. At the same time the Maxima left 3038 Brookdale, Burrus was seen leaving in the Infiniti. Investigators followed him to the McDonald's on Perkins, where they saw him meet with first a white female and then a Black male, each of whom met Burrus at his driver's side window and conducted an exchange with him. Burrus left the McDonald's, drove to the Marathon, parked for about seven minutes, left without pumping gas or going inside, and returned to 3038 Brookdale. The affidavit notes that these activities are also indicative of drug trafficking and states that "after these transactions Burrus routinely has been shown to return home with the drug proceeds from the narcotics transactions." The affidavit also notes that drug trafficking is a cash-intensive business, that drug traffickers often maintain large stashes of cash at their residences, and that drug traffickers possess firearms, ammunition, and magazines to protect themselves during their drug dealings, which are often possessed and stored at their residences.

Based on the affidavit, Judge John Campbell of the Criminal Court of Shelby County, Tennessee, found probable cause that Burrus and Jones had in their possession "Heroin, Fentanyl, Methamphetamine, Cocaine, Firearms, Firearms Accessories, Drug Paraphernalia, and Drug Proceeds" and issued a warrant to search the residence at 3038 Brookdale Street, as well as

any automobiles and outbuildings associated with the residence.  (*Id.* at 1.)  Judge Campbell

signed the search warrant on January 15, 2021.  The search warrant was executed on January 19,

2021, and officers recovered marijuana, powder cocaine, crack cocaine, heroin,

methamphetamine, six firearms, $11,082 in cash, and a key labeled "Move N Store."  (ECF No.

41-2, at 3.)  Burrus and Jones were arrested during execution of the warrant.  (*Id*.)

On February 9, 2021, Sergeant Timothy Bogue, another member of the Heroin Opioid

Response Team, applied for a warrant to search three storage units (units F8, F10, and G22) at

the U-Store Self Storage at 5515 Winchester Road, Memphis, Tennessee 38115.  (*Id.*)  Sergeant

Bogue provided the same affidavit in support of the request for each search warrant.  He related

that Burrus and Jones had been arrested pursuant to the January 19 search warrant and described

the items investigators found at 3038 Brookdale.  He indicated that investigators had obtained

search warrants for multiple telephones seized from Burrus the day of his arrest, and they saw on

those telephones "text messages with individuals that were attempting to purchase narcotics from

Burrus on several occasions."  Burrus stated in texts "that he was sending Cindy/Pinky . . . or the

individual needed to call Cindy/Pinky to complete the deal."  The affidavit states that Pinky is a

moniker Jones had provided in a previous arrest.  The telephones also had "multiple pictures of

Burrus in possession of substantial amounts of bulk cash packaged in vacuum sealed bags."  The

labels on the bags led investigators to estimate an amount in excess of $85,000 in one picture.

The affidavit further states that Burrus uses his family and associates to aid his narcotics

trafficking and describes the content of recorded jail calls.  (*Id.*)  Those calls include discussions

regarding various associates (Demetrious Jones, Tanyia Jones, Yiala Jones, Claibon Burrus III,

Inell Holley,[2] and Frederick Jolly) aiding in the conspiracy.  The affidavit generally states that

---

[2] The affidavit spells this name once as "Innell" but otherwise as "Inell."

Burrus "expressed concern over evidence that was not recovered that he is worried about the police seizing." In the recorded calls, Burrus told Cindy Jones to move the evidence, but she told him it was "secure with his stuff up there and that she has a key." Burrus told Tanyia Jones "to clean up on his behalf," and she responded that she had already begun the process. Burrus told an individual, who investigators believe to be Demetrious Jones, to "advise 'Big Red' a.k.a. Tanyia Jones that she needed to cut what she was working with." The affidavit indicates investigators' knowledge that cutting is a reference to diluting the purity of narcotics to maximize profits. Finally, Burrus spoke with Inell Holley, Cindy Jones's mother, about his arrest, his defense, and "how he could be able to get himself off of the criminal charges."

The affidavit states that, on February 8, 2021, Sergeant Overly[3] subpoenaed U-Store for records regarding units connected with Burrus and his associates. (*Id.*) The district manager of U-Store provided information that Cindy Jones was the listed renter of unit F8, with secondary contacts identified as Burrus, Tanyia Jones, and Inell Holly. Investigators observed that unit F8 was secured by a copper-colored, "Move N Store" lock—the same brand as the key found at 3038 Brookdale. Other U-Store employees advised that a Black male paid cash monthly for units F8 and F10 (which rented in the name of Tanyia Jones). They had nicknamed this individual "Gucci Man" because he always wore Gucci clothing. The employees identified Burrus as Gucci Man in a photograph. They further "showed investigators that there was significant entries and exits, including the opening and closing of unit F10" the day the warrant was executed at 3038 Brookdale. Finally, they indicated that Inell Holley was also listed as a secondary contact for unit G22 (the primary name being Tayanna Bland). Holley lives at 5371

---

[3] This second affidavit refers to Overly as "Lt. Overly"; the Court will continue to refer to him as Sergeant Overly for the sake of clarity.

Finchwood with three others, all three of whom have felony narcotics arrests, and both Burrus

and Cindy Jones provided that address upon their arrest in 2012 for possession of felony amounts

of heroin and cocaine.

Sergeant Overly "utilized his ADCA certified K-9 'Rocky' to conduct a free air sniff of

Units F10 and G22." (*Id.*)  Rocky positively alerted to the odor of narcotics in both units.  The

affidavit notes that, "[b]ased on Investigators['] experience and training, drug traffickers often

hide drug proceeds, drug ledgers, financial documents, and other assets in storage units."  Such

units are often rented in the name of others to avoid detection by law enforcement.  "In the past,

Detectives have made substantial seizures of assets concealed in storage facilities that are in the

name of nominee individuals."

Sergeant Bogue concluded the affidavit by detailing his experience.  As a member of

MPD's Heroin Opioid Response Team, he was responsible for investigating upper-level drug

dealers who traffic large quantities of illegal narcotics.  He had received specialized education

and training in the investigation and detection of illegal drug activity, had been a police officer

since 2006, and had "participated in numerous drug arrests, drug seizures, and drug

investigations." (*Id.*)

Based on the affidavit, Judge Mark Ward of the Criminal Court of Shelby County,

Tennessee, found probable cause that Burrus and Jones had in their possession "Controlled

Substances, Drug Proceeds, Drug Records, Drug Paraphernalia, Firearms, Ammunition and

Firearm Accessories" and issued warrants to search units F8, F10, and G22 at the U-Store.  (*Id.*

at 1.)  Judge Ward signed the search warrant on February 9, 2021.  The search warrant was

executed that day.  In unit F8, officers recovered a hydraulic press (described by the United

States as commonly used to prepare large quantities of narcotics for packaging), two cell phones,

a rifle, and ammunition.  In unit F10, officers recovered six firearms, three digital scales, cocaine, fentanyl, heroin, methamphetamine, and various pills.  No narcotics or firearms were found in unit G22.  (ECF No. 41, at 3–4.)

On September 16, 2021, a federal grand jury returned an indictment charging Burrus with three counts of violations of 21 U.S.C. § 841(a)(1) for knowingly possessing with intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a substance containing cocaine, and 40 grams or more of fentanyl; six counts of knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and thirteen counts of knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

## PROPOSED CONCLUSIONS OF LAW

Burrus seeks suppression of the fruits of illegal searches unsupported by probable cause. Burrus bears the burden of proof.  *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979))).

I.    **The Search Warrant for the Residence**

A.    Probable Cause

The issue before the Court is whether the affidavit to search 3038 Brookdale provided probable cause for issuance of the warrant.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. Amend. IV. "In reviewing the sufficiency of the evidence supporting probable cause, we are limited to

examining the information contained within the four corners of the affidavit.  Nevertheless, when considering that information, we look to the totality of the circumstances." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005); *Illinois v. Gates*, 462 U.S. 213, 230 (1983)); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) ("Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny."  (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004))).

"'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion,' and is found to exist when there is 'a "fair probability" that evidence of a crime will be located on the premises of the proposed search.'" *Jackson*, 470 F.3d at 306 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990); *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)).  "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)).  The reviewer of a search warrant application is "to make a practical, common-sense decision," based on "all the circumstances set forth in the affidavit." *Id.* (quoting *Gates*, 462 U.S. at 238).

"The standard of review for determining the sufficiency of the affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *Rodriguez-Suazo*, 346 F.3d at 643 (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).  "[T]he magistrate's probable cause determination should be afforded great deference." *Id.* (quoting *Davidson*, 936

F.2d at 859).  That "deferential review is consistent with 'the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'"  *Id.* (quoting *Gates*, 462 U.S. at 236).

Burrus challenges the sufficiency of the probable cause in the affidavit on multiple bases. First, Burrus questions the reliability of the confidential source.  "When an affidavit relies on information from a confidential source . . . , examining the totality of the circumstances includes examining the 'veracity, reliability, and basis of knowledge' of the source."  *United States v. Helton*, 35 F.4th 511, 518 (6th Cir. 2022) (quoting *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018)).  "The veracity, reliability, and basis of knowledge of a source 'are not separate and independent requirements to be rigidly exacted in every case.'"  *Id.* (quoting *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotations omitted)).  Information from a confidential source can support a finding of probable cause where the affidavit contains "facts supporting an independent judicial determination that the informant is reliable," such as corroboration of the source's information or an attestation that the source had "provided reliable information in the past."  *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005) (citing *United States v. Allen*, 211 F.3d 970, 975–76 (6th Cir. 2000)).

Burrus argues that the affidavit does not establish the source's reliability because it does not indicate the source had provided reliable information in the past and it does not indicate how recent or fresh the source's information was.  Burrus is correct that the affidavit provides no information regarding past reliable information from the source.  The affidavit does demonstrate, however, that investigators were able to corroborate much of the information provided by the source.  Investigators learned from the confidential source that an individual known as "Yai," ultimately identified by the source as Burrus, was known to sell heroin and cocaine and routinely sold heroin to Jessica Oldaker, who appears to have suffered a fatal overdose on December 2,

2020.  The source provided investigators with Burrus's telephone number; home address; the cars he drove, including a license plate number of a silver Infiniti; locations where he met his narcotics customers, including a McDonald's and a Marathon station on Perkins; and descriptions of Burrus's associates who assisted in his drug trade.

Investigators then turned to corroborating that information.  They established that the telephone number provided by the confidential source was assigned to "Boyia Burrus," supporting the source's information that the number belonged to Burrus.  They established that Burrus had telephonic contact with Oldaker, as well as with four other individuals known to possess narcotics.  They also learned that Burrus had previously been the target of a search warrant where narcotics were found.  They established that the source was correct about the location of Burrus's residence at 3038 Brookdale and about the model and license plate number of the car Burrus drove.  They observed Burrus leave his residence, drive to the McDonald's and Marathon station identified by the source, as well as other locations on Perkins, where he had interactions with people through the window of his car, which the investigators deemed indicative of drug transactions, and then return home, all consistent with the source's information about Burrus's drug trafficking.  This corroboration of the detailed information provided by the confidential source is sufficient to establish the source's reliability.  *See, e.g.*, *United States v. Howard*, 632 F. App'x 795, 805 (6th Cir. 2015) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing 'a substantial basis for crediting the [informant's] hearsay.'" (quoting *Gates*, 462 U.S. at 244–45)).  For the same reasons, the affidavit's failure to specify how fresh the source's information was does not render that information unreliable, as it was sufficiently corroborated by Burrus's then-current conduct.  The information provided by

11

the confidential source was reliable and was properly considered as part of the probable cause supporting the search warrant request.

Next, Burrus argues that the affidavit fails to establish probable cause that the interactions investigators observed him have at the various Perkins locations were drug transactions. Burrus notes that the affidavit does not state that investigators witnessed the transfer of any drugs or money in those interactions. Those interactions, however, must be judged under the totality of the circumstances. Burrus's history of possession of narcotics, his telephonic communications with others known to possess narcotics, and the information provided by the confidential source all indicate that Burrus was involved in drug trafficking. With that background, the facts regarding Burrus's interactions on Perkins strongly suggest those interactions were drug transactions. For example, Burrus was seen leaving his home on January 11, 2021, driving to a laundromat and meeting with an individual through his car window, then driving to the Marathon and parking at a pump for eight minutes, then meeting another individual through his car window, then driving home via a "roundabout" route at a "very slow speed." On January 13, 2021, Burrus was seen leaving his home, driving to the McDonald's, meeting with an individual through his car window and "conduct[ing] an exchange," "conduct[ing] an exchange" with another individual through his car window, then briefly visiting a shopping center, then returning to the McDonald's where he met with another individual, and then driving to the Marathon, where he sat in his car for seven minutes without pumping gas or going into the station, after which he returned home. The affidavit further states that these activities are indicative of drug trafficking. Based on the totality of those circumstances, the affidavit provides probable cause that Burrus was engaged in hand-to-hand drug transactions.

Burrus also argues that investigators did not attempt to corroborate these suspected drug transactions by conducting a controlled purchase or a traffic stop of any of the individuals interacting with Burrus.  However, in reviewing a search warrant for probable cause, a court is "to look holistically at what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit."  *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (citing *Hines*, 885 F.3d 919, 921–22).  Because the affidavit otherwise establishes probable cause to conduct the search of 3038 Brookdale, the absence of controlled purchases and traffic stops is not fatal to that conclusion.

Finally, Burrus argues that the affidavit fails to establish a nexus between the items to be seized and Burrus's home.  Burrus points out that the suspected hand-to-hand transactions did not occur at 3038 Brookdale and contends that investigators had no evidence of narcotics located at that residence.  On the contrary, however, Burrus's participation in the interactions described above begin with him leaving his home, driving to the various interactions, and then driving home.[4]  Such circumstances provide probable cause that Burrus was storing narcotics and/or proceeds of narcotics sales in that home.  "Courts have upheld residential searches where a defendant drives directly from his home to a drug sale, sells drugs immediately after leaving his house, or returns home after collecting drug proceeds."  *United States v. Dawson*, No. 21-4142, 2022 WL 4245698, at *2 (6th Cir. 2022) (citing *United States v. White*, 990 F.3d 488, 492 (6th Cir. 2021)).  Those circumstances also tend to corroborate the confidential source's information

---

[4] The affidavit also provides that "after these transactions Burrus routinely has been shown to return home with the drug proceeds from the narcotics transactions," without further detail.  It is unclear whether the affiant is stating that Burrus was seen walking into his home carrying cash, or whether the statement is based on the investigators' knowledge that "drug trafficking is a cash intensive business" and their probable cause to believe Burrus was returning home after engaging in drug transactions.  Given the lack of clarity, this statement is not considered for purposes of determining the sufficiency of the affidavit.

that Burrus stored narcotics at 3038 Brookdale.  Though it is possible that Burrus was not

engaging in drug transactions, and thus that he did not have narcotics or proceeds in his home,

"possibility is not the touchstone.  The question is whether there is a 'fair probability' or a

'common-sense' inference that the house contains [narcotics]."  *White*, 990 F.3d at 492 (quoting

*Gates*, 462 U.S. at 238).  Because that question must be answered in the affirmative in this case,

denial of the motion to suppress is recommended.

      B.    <u>Good Faith Exception</u>

      Even if the affidavit is unsupported by probable cause, the good-faith exception to the

exclusionary rule applies.  Under that exception, "even if the search warrant were found to be

fatally defective, the evidence would not be suppressed 'if the seizure was based on reasonable,

good faith reliance on the warrant.'"  *United States v. Hill*, 27 F.4th 1155, 1192 (6th Cir. 2022)

(quoting *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006)).  "The 'good faith inquiry

is confined to the objectively ascertainable question whether a reasonably well trained officer

would have known that the search was illegal despite the magistrate's authorization.'"  *Id.*

(quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).  "[T]he burden rests on the

government to prove that [the executing officer's] reliance on a warrant was objectively

reasonable."  *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *9 (E.D. Mich. May

4, 2015) (quoting *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014)).

      The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment

violations."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing, e.g., *Herring v. United

States*, 555 U.S. 135, 141 (2009)).  Its operation is thus limited "to situations in which this

purpose is 'thought most efficaciously served.'  Where suppression fails to yield 'appreciable

deterrence,' exclusion is 'clearly . . . unwarranted.'"  *Id.* (quoting *United States v. Calandra*, 414

U.S. 338, 348 (1974); *United States v. Janis*, 428 U.S. 433, 454 (1976)).  In addition to deterrence, "[t]he analysis must also account for the 'substantial social costs' generated by the rule," which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Leon*, 468 U.S. at 907).  Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 910).

That "cost-benefit analysis" focuses on "the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *Leon*, 468 U.S. at 909).  "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144).  "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force' . . . ." *Id.* (quoting *Leon*, 468 U.S. at 919).  A warrant "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"—a "bare bones affidavit"—"shows that the officer recklessly relied on the judge's decision that probable cause existed for the warrant." *United States v. Reed*, 993 F.3d 441, 450 (6th Cir. 2021) (quoting *Leon*, 468 U.S. at 923; *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)).

As relevant in this case, "[f]or an officer's reliance to have been reasonable, the application must have provided 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quoting *Brown*, 828 F.3d at 385).  A "substantial basis" for that nexus is not required, "only 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight.'" *Id.* (quoting *White*, 874 F.3d at 497).  "[A] link between the drug dealer's activities and

his home that would be insufficient to establish probable cause may suffice to establish good-faith reliance on the warrant." *Id.* at 417 (citing *Frazier*, 423 F.3d at 537); *see also Reed*, 993 F.3d at 450 ("There obviously 'must be daylight' between the two standards because *Leon*'s exception applies only when an affidavit falls short of probable cause." (quoting *White*, 874 F.3d at 497)). However, the affidavit must still "present some 'particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions.'" *McCoy*, 905 F.3d at 416 (citing *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006)).

As discussed above, the affidavit in this case provides particularized facts that at least present a modicum of evidence that Burrus was engaged in drug trafficking and kept drugs or proceeds in his home. Investigators learned from a confidential source that Burrus was known to sell heroin and cocaine and to keep narcotics stored in his home. Investigators were able to corroborate much of the information the confidential source gave them. Investigators further observed Burrus leaving his home to engage in interactions highly suggestive of hand-to-hand drug transactions and then returning home. Armed with that information, along with their experience-based knowledge that drug dealers keep narcotics and other indicia of drug sales in their homes, investigators formed a belief that evidence of drug trafficking would be found at Burrus's home. The combination of that information and knowledge forms reasonable grounds for that belief. The good faith exception thus applies to bar application of the exclusionary rule in this case.

## II.   The Search Warrants for the Storage Units

Burrus's primary argument regarding the storage units is that the search warrants for those units were based on information obtained from the search of Burrus's residence, which

16

Burrus claims was unconstitutional, and thus any evidence obtained from the storage units is fruit of the poisonous tree. *See, e.g.*, *United States v. Grant*, No. 21-3686, 2023 WL 119399, at *4 (6th Cir. Jan. 6, 2023) ("Under the fruit of the poisonous tree doctrine, any evidence which police derivatively obtain[ed] from an unconstitutional search or seizure is inadmissible," and, "[b]y extension, information gained by law enforcement officers during an illegal search cannot be used in a derivative manner to obtain other evidence." (internal quotations omitted)).  Though the storage unit searches did result in the collection of fruit of the prior search of the residence, that fruit, in this case, was not poisonous.  As discussed above, the residence search was conducted pursuant to a valid search warrant, and officers thus properly relied on information learned from the residence search in support of their request for search warrants for the storage units. *See, e.g.*, *United States v. Powell*, No. 21-1098, 2022 WL 2612242, at *5 (6th Cir. July 8, 2022) (finding the defendant's fruit-of-the-poisonous-tree argument "fails with a finding that the search warrant established probable cause"); *Helton*, 35 F.4th at 522 (applying the good-faith exception to a search warrant and thus finding that the fruit-of-the-poisonous-tree doctrine did not apply to evidence found pursuant to a subsequent, derivative search warrant).

The storage unit search warrants are also supported by probable cause.  The affidavit supporting those warrants details that Burrus and Jones had been arrested after officers found marijuana, cocaine, heroin, methamphetamine, six firearms, and $11,082 in their home.  Also found in the home was a key labeled "Move N Store" and multiple telephones containing text messages regarding drug transactions and photographs of Burrus with large amounts of cash.  In jail calls recorded after the arrest, Burrus expressed concern that law enforcement would find additional evidence and told Cindy Jones to move the evidence.  Jones responded that the evidence was "secure with his stuff up there and that she has a key."  Burrus told Tanyia Jones

"to clean up on his behalf," and she responded that she had already begun the process. Investigators located the U-Store storage units—F8 rented in Cindy Jones's name and F10 rented in Tanyia Jones's name[5]—and U-Store employees identified Burrus as having paid the monthly rental fee for those units.  Employees also relayed that unit F10 was opened and closed on the day the warrant was executed at 3038 Brookdale, and investigators saw that unit F8 was locked with the same brand of lock as the key found in that residence.  Investigators had an "ADCA certified K-9 'Rocky'" sniff units F10 and G22, and Rocky positively alerted to both.  Finally, the affiant relayed, based on his experience and training, that drug traffickers often use storage units to house drug proceeds, ledgers, financial documents, and other assets and often have the units rented in others' names to avoid detection.

These facts constitute probable cause to search units F8 and F10.[6]  The affidavit connects Burrus to both units, stating that he paid monthly rent in cash for both, and it connects him to drug trafficking, describing text messages from prospective purchasers and photographs of large amounts of cash, along with the narcotics, firearms, and cash found in 3038 Brookdale.  Unit F10 was accessed the day of Burrus's arrest, and Burrus instructed his associates to hide evidence after his arrest.  The totality of that information, combined with an experienced officer's knowledge that drug traffickers often keep evidence of their crimes in storage units, exhibited a fair probability that evidence of crime would be found in the units.

The positive alert to narcotics by Rocky increases that probability as to both storage units.  As to unit F10, Rocky's alert indicates the presence of narcotics in the unit.  As to unit F8,

---

[5] The affidavit indicates that investigators subpoenaed U-Store for records regarding Burrus and his associates, but it does not indicate how law enforcement identified U-Store as the possible location of storage units utilized by Burrus.

[6] No evidence was recovered from unit G22, rented in the name of Jones's mother, and thus the search warrant for unit G22 need not be considered for purposes of suppression.

Rocky's alert on unit F10 increases the likelihood that Burrus used unit F8 to store evidence of drug trafficking as well.  Burrus argues that the affidavit supporting the warrant requests does not establish Rocky's reliability.[7]  "A positive reaction by a properly trained narcotics dog can establish probable cause for the presence of controlled substances.  However, for such a reaction to support a determination of probable cause, the training and reliability of the dog must be established."  *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996) (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)).  However, "the affidavit need not describe the particulars of the dog's training."  *Id.* (finding that "the affidavit's accounting of the dog sniff indicating the presence of controlled substances and its reference to the dog's training in narcotics investigations was sufficient to establish the dog's training and reliability").

Here, the affidavit states that "Overly utilized his ADCA certified K-9 'Rocky' to conduct a free air sniff of Units F10 and G22.  'Rocky' gave a positive alert to the odor of Narcotics on both units F10 and G22."  (ECF No. 41-2, at 3.)  The affidavit does not indicate whether Rocky has proven reliable in the past and provides no further information regarding what the ADCA is or what its certification process entails.  In context, however, it is reasonable to conclude that Judge Ward understood the reference to Rocky as "ADCA certified" to indicate that Rocky was trained in scent detection of narcotics.  *See United States v. Venema*, 563 F.2d 1003, 1007 (10th Cir. 1977) (cited with approval in *Berry*, 90 F.3d at 153) ("Assuming, therefore, that the magistrate was a qualified official possessing ordinary and reasonable

---

[7] Burrus also argues that Rocky was demonstrated unreliable because he conducted a sniff of Units F10 and G22 and positively alerted to the odor of narcotics in both, but narcotics were not found in G22.  As counsel for Burrus conceded at the hearing, however, the results of the searches would not have been known to Judge Ward when he signed the warrants.  Rocky's demonstrated error is therefore irrelevant to the analysis of whether probable cause supported the issuance of the warrants.

intelligence and prudence it does not in our view defy logic to conclude that the magistrate understood that the 'trained dog' was endowed, by reason of experience and training, with the ability to sniff out cocaine.").  The statements about Rocky's positive alert are therefore properly considered as contributing to the probable cause set out in the affidavit.  As discussed above, however, even without Rocky's positive alert on unit F10, the affidavit establishes probable cause to search units F8 and F10.

Furthermore, the good-faith exception to the exclusionary rule once again precludes suppression.  Even if the information provided about Rocky is insufficient to establish his reliability, the reference in the affidavit to a "positive alert to the odor of Narcotics" in the storage units by an "ADCA certified K-9" demonstrates that the investigators did not recklessly rely on an incorrect determination of probable cause.  That information, combined with the other information linking Burrus to drug trafficking and to the storage units, as discussed above, provides a substantial basis for suspecting that the storage units contained evidence of drug trafficking.  The affidavit is by no means bare bones and instead is sufficient to support an objectively reasonable, good-faith belief that the probable cause determination was lawful.  *See Davis*, 564 U.S. at 238; *Reed*, 993 F.3d at 450.  The motion to suppress the evidence recovered from units F8 and F10 should therefore be denied.

## RECOMMENDATION

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 3rd day of May, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

### NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.