# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-cr-20204-JTF |
| ) | |
| CLAIBON BURRUS, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION ON SECOND MOTION TO SUPPRESS

Before the Court is Defendant Claibon Burrus's second Motion to Suppress, filed November 21, 2023. (ECF No. 59.) District Judge John T. Fowlkes, Jr., referred the motion to the undersigned for report and recommendation.[1] (ECF Nos. 62, 66.) The United States responded in opposition on February 16, 2024. (ECF No. 68.)

The Court held a hearing on May 2, 2024. (ECF No. 48.) At the hearing, the United States called one witness, Detective Onrico Atkins,[2] and introduced one exhibit: the search warrant that is the subject of the instant motion (Exhibit 1).[3]

---

[1] The motion is styled as a "Motion to Late File Motion [to] Suppress," but, as Judge Fowlkes explained in the order of reference, that filing itself contains arguments regarding the newly raised suppression issues. (ECF No. 62.)

[2] Atkins has since been promoted to Second Lieutenant but will be referred to herein as Detective, consistent with how he was identified in the affidavit supporting the search warrant at issue.

[3] A redacted version of the warrant appears in the record at ECF No. 68-1, and the warrant will therefore be referred to herein with that citation.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, the Court recommends that the motion be denied.

## PROPOSED FINDINGS OF FACT

On January 5, 2021, Detective Atkins with the Memphis Police Department ("MPD") applied for a warrant to search the call detail records and GPS location information associated with the telephone number 901-491-7846 (the "Subject Number"), by completing and executing, under oath, an affidavit for a search warrant. (ECF No. 68-1.) As grounds for issuance of the search warrant, Detective Atkins indicated that he was assigned to a narcotics investigation team within the MPD's Organized Crime Unit ("OCU") and was responsible for investigating drug overdoses and the drug sales that cause those overdoses. He had received specialized education and training in the investigation and detection of illegal drug activity, had been a police officer since 2008, and had "participated in numerous drug arrests, drug seizures, and drug investigations." (*Id.* at 3.)

The affidavit describes the investigation into the death of J.O., who was found deceased by her mother in a bathtub in her home on December 2, 2020. (*Id.*) J.O.'s mother indicated that J.O. was a recovering drug addict who preferred to use heroin. Investigators located J.O.'s cellphone, two plastic bags containing 1.2 grams of fentanyl, and "drug use paraphernalia." J.O.'s boyfriend advised investigators that J.O. "would routinely contact her drug dealer known as 'Yay' at" the Subject Number and would buy "varying amounts of Heroin" from Yay "at several public locations in the area of Perkins and Knight Arnold." At the hearing, Detective Atkins testified that he could not recall if investigators looked into the reliability of J.O.'s boyfriend before obtaining the warrant. (*Id.*)

Investigators researched[4] the Subject Number in MPD databases and learned that, in 2018, the Subject Number was in contact with an individual, F.W., who was identified as a half-kilogram-to-kilogram supplier of heroin and fentanyl "to several upper level Memphis area sources of supply" and who was arrested in July of 2018 with a "large quantity" of heroin and methamphetamine. (*Id.*) The affidavit then states:

> An Undercover (UC) Memphis Police Officer called [the Subject Number] and spoke with a male user. The UC attempted to arrange the purchase of illegal narcotics. The male user advised the UC that he would not sell to the UC because the male did not recognize the UC as a usual customer.

At the hearing, Detective Atkins testified that this undercover call occurred in 2018, not as a part of his investigation into J.O.'s death in 2020.

The affidavit then indicates investigators' belief that the records for the Subject Number could provide "information on the location where narcotics are stored and where drug proceeds are stored," could provide "the phone numbers of potential co-conspirators," and could place the Subject Number's user "in contact with the victim of the overdose" and "in close proximity to the location the victim frequented prior to her death." (*Id.*)

Based on the affidavit, Judge Chris Craft with the Criminal Court of Shelby County, Tennessee, found probable cause that the records for the Subject Number were needed as evidence in the investigation of narcotics trafficking and issued a warrant to search those records. (*Id.* at 1.) The search warrant was signed on January 5, 2021. The execution of that warrant led to requests for additional warrants and ultimately to the arrest of Burrus. (ECF No. 59 ¶ 6.)

At the hearing, Detective Atkins credibly testified that he had been personally involved in obtaining fifty search warrants, more or less, throughout his career, including numerous narcotics

---

[4] At the hearing, Detective Atkins testified that this research was conducted in December 2020.

3

warrants.  He is familiar with the process of obtaining a search warrant from a Shelby County Criminal Court judge, which typically involves taking the warrant to the judge for him to review, sign, and return.  In this case, he prepared the warrant at his desk at the OCU and then took it to Judge Craft's bench, where Judge Craft reviewed and signed it in Detective Atkins's presence.  Detective Atkins testified that he discussed the facts of the case with Judge Craft, who "wanted to be familiar with what was going on," and so Detective Atkins "explained to him some of the facts."  Detective Atkins did not recall the questions asked by Judge Craft or the specific facts discussed, but he did not believe they would have discussed information not provided in the affidavit itself because he typically only talks about what is presented in the affidavit.  Detective Atkins then reviewed the warrant to ensure it was signed and completed properly, and he had no concerns that the warrant was not valid.  He sent the warrant to the service provider, AT&T, which provided the requested records and did not indicate that anything on the warrant was incomplete or invalid.

On September 16, 2021, a federal grand jury returned an indictment charging Burrus with three counts of violations of 21 U.S.C. § 841(a)(1) for knowingly possessing with intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a substance containing cocaine, and 40 grams or more of fentanyl; six counts of knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and thirteen counts of knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

**PROPOSED CONCLUSIONS OF LAW**

Burrus argues for suppression of the fruits of an illegal search unsupported by probable cause. Burrus bears the burden of proof. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979))).

**I.   Probable Cause**

Burrus first argues that the information provided in the affidavit is insufficient to establish probable cause. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit.[5] Nevertheless, when considering that information, we look to the totality of the circumstances." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005); *Illinois v. Gates*, 462 U.S. 213, 230 (1983)); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) ("Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny." (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004))).

---

[5] Because the probable-cause review is limited to the four corners of the affidavit, the Court will not consider Detective Atkins's testimony in this assessment. As the United States confirmed at the hearing, Detective Atkins's testimony was presented to address Burrus's good faith arguments, discussed below.

"'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion,' and is found to exist when there is 'a "fair probability" that evidence of a crime will be located on the premises of the proposed search.'" *Jackson*, 470 F.3d at 306 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990); *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The reviewer of a search warrant application is "to make a practical, common-sense decision," based on "all the circumstances set forth in the affidavit." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Gates*, 462 U.S. at 238).

"The standard of review for determining the sufficiency of the affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *Rodriguez-Suazo*, 346 F.3d at 643 (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). "[T]he magistrate's probable cause determination should be afforded great deference." *Id.* (quoting *Davidson*, 936 F.2d at 859). That "deferential review is consistent with 'the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'" *Id.* (quoting *Gates*, 462 U.S. at 236).

Burrus challenges the sufficiency of the probable cause in the affidavit as based on (A) an unreliable source and (B) stale information.

     A.     <u>Source Reliability</u>

First, Burrus questions the reliability of the information provided by J.O.'s boyfriend. Burrus notes that the affidavit does not identify the boyfriend by name, nor does it provide any details about his relationship with J.O., including its duration or status. The lack of such details does not necessarily render the information unreliable, however.

6

"The relevant inquiry for informant-based affidavits is whether sufficient indicia of reliability exist to support a finding of probable cause." *United States v. Gamble*, No. 22-5194, 2022 WL 17456308, at *5 (6th Cir. Dec. 6, 2022) (citing *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005)). Under the totality-of-the-circumstances approach,

> while an affidavit must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form. The affidavit could state that police corroborated significant parts of the informant's story. Or the affiant could attest 'with some detail' that the informant provided reliable information in the past. Or there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause.

*McCraven*, 401 F.3d at 697 (citing *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000)).

The interplay between these various methods of demonstrating reliability are examined in *United States v. Thomas*, where the Sixth Circuit found probable cause despite "an affidavit offering a relatively thin justification." 605 F.3d 300, 308 (6th Cir. 2010). At issue in *Thomas* was information provided by a confidential informant whom the affiant attested had provided reliable information within the past year that led to three prosecutions, including two federal convictions. *Id.* at 304. The CI informed investigators that the target had a reputation in the community for being a successful producer of an expensive form of marijuana and told them where the target lived. *Id.* The CI said that he/she had observed narcotic transactions at the residence on at least three occasions, though no information was provided in the affidavit of the recency of those transactions. *Id.* Investigators confirmed that the target resided at the address and independently learned that the residence had unusually high electricity usage, indicative of a marijuana grow operation. *Id.* at 304–05. The court thus described that affidavit as providing "specific information" from the CI about a crime, "some detail" about the CI's prior positive

7

record of reliability, and corroboration of "significant parts" of the CI's story. *Id.* at 308. Based on the totality of that information, the court found "the affidavit provided a reasonable basis for believing that evidence of marijuana possession and manufacture would be found at the" residence. *Id.*

This type of fact-specific inquiry leads to the conclusion that the affidavit in this case demonstrates the reliability of the information provided by J.O.'s boyfriend. Like in *Thomas*, the boyfriend provided specific information about a crime—he identified "Yay" as J.O.'s drug dealer, he stated that she "routinely" contacted called Yay and provided Yay's phone number, and he relayed that Yay sold varying amounts of heroin to J.O. "at several public locations in the area of Perkins and Knight Arnold." (ECF No. 68-1, at 3.) Also like in *Thomas*, where investigators were able to corroborate the CI's information about a marijuana grow operation at the target's residence via the high electricity usage at the residence, here investigators were able to corroborate the boyfriend's information about the Subject Number via the Subject Number's 2018 contact with a known heroin and fentanyl supplier and the undercover call to the Subject Number where the recipient declined the sale because the caller was not a usual customer.[6] *See, e.g.*, *United States v. Howard*, 632 F. App'x 795, 805 (6th Cir. 2015) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing 'a substantial basis for crediting the [informant's] hearsay.'" (quoting *Gates*, 462 U.S. at 244–45)).

Moreover, though the affidavit provides no indication of prior reliability, here the information was provided by J.O.'s boyfriend—not a confidential source or anonymous tipster—

---

[6] In addition, J.O.'s mother informed investigators that J.O. was "a recovering drug addict who preferred to use Heroin," corroborating the boyfriend's statements about J.O.'s heroin use. (*Id.*)

a relationship that provides a firmer foundation for reliability than a source unconnected to a victim or target.[7] Though Burrus is correct that the affidavit does not indicate the length of the source's relationship with J.O., the affidavit describes the source as "[t]he victim's boyfriend" (not former boyfriend) and recounts the detailed information he was able to provide about J.O.'s drug use, indicating his relationship with J.O. was close enough to have knowledge of these intimate aspects of her life. Though none of these facts, if viewed in a vacuum, may independently demonstrate the reliability of the boyfriend's information, the totality of these circumstances indicates that his information was properly considered as part of the probable cause supporting the warrant.

    B.    <u>Staleness</u>

Burrus also contends that the affidavit relies primarily on stale information. "[S]tale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377–78 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "The expiration of probable cause is determined by the circumstances of each case and depends on the inherent nature of the crime." *United States v. Hython*, 443 F.3d 480, 485 (6th

---

[7] The fact that the informant is identified only as J.O.'s "boyfriend," with no name provided in the affidavit, does not eliminate the impact of this identification. The affidavit states that the boyfriend "advised Sergeant Overly" of his relevant information (ECF No. 68-1, at 3), implying that his identity was known to the investigators. Where a source is named in a warrant application, the source's statements "are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." *United States v. Hodge*, 714 F.3d 380, 384–85 (6th Cir. 2013); *see also United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002) (citing *Adams v. Williams*, 407 U.S. 143, 146–147 (1972)) (recognizing that the threat of prosecution for providing false information enhances the reliability of a tipster known to investigators). Though the boyfriend's name was not stated in the affidavit, the logic of this authority still applies—he was known to the investigators and could have faced prosecution for providing fabricated information.

Cir. 2006) (citing *Sgro v. United States*, 287 U.S. 206, 210–11) (1932); *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)).

> Relevant variables include "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?)[, and] the place to be searched (mere criminal forum of convenience or secure operational base?)."

*Id.* (quoting *Spikes*, 158 F.3d at 923).

Burrus largely focuses on the affidavit's description of the 2018 investigation, arguing that the Subject Number's contact with F.W., a known drug supplier, was over two years old and that no effort had been made to show that the Subject Number still belonged to the same person it had in 2018. Burrus also claims that the affidavit gives no indication of when J.O. purchased drugs from Yay. That argument, however, ignores the totality of the information provided by J.O.'s boyfriend. The affidavit indicates that, during the investigation into J.O.'s death, where she was found in a bathtub, and where fentanyl was also found, her boyfriend told investigators that she "would routinely contact her drug dealer known as 'Yay' at" the Subject Number. (ECF No. 68-1, at 3.) The common-sense reading of that information is that, before her death, J.O. regularly and recently contacted her drug dealer using the Subject Number. The boyfriend's use of the word "routine" in that context reasonably indicates that his information did not relate to a distant time in the past and thus was not stale.

With that understanding, the relevance of the 2018 investigation to probable cause is enhanced, not diminished. The affidavit relays that, in 2018, a known supplier "was in contact" with the Subject Number and that, at some unknown time, an undercover officer called the Subject Number, asking to purchase drugs, and was rejected, not because the recipient was not a drug dealer, but because the caller was not the recipient's usual customer. (*Id.*) The affidavit

thus demonstrates that the Subject Number was connected to drug trafficking in 2018 and was connected to drug trafficking in 2020, suggesting an ongoing enterprise over multiple years and increasing the likelihood that the Subject Number's records would contain evidence of a crime.

The information in the affidavit was neither unreliable nor stale, and the totality of that information provides probable cause to support the search of the Subject Number's records. It is recommended that the motion to suppress be denied.

## II.     Good Faith Exception

Even if the affidavit is unsupported by probable cause, the good-faith exception to the exclusionary rule applies. Under that exception, "even if the search warrant were found to be fatally defective, the evidence would not be suppressed 'if the seizure was based on reasonable, good faith reliance on the warrant.'" *United States v. Hill*, 27 F.4th 1155, 1192 (6th Cir. 2022) (quoting *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). "[T]he burden rests on the government to prove that [the executing officer's] reliance on a warrant was objectively reasonable." *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *9 (E.D. Mich. May 4, 2015) (quoting *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014)).

The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing, e.g., *Herring v. United States*, 555 U.S. 135, 141 (2009)). Its operation is thus limited "to situations in which this purpose is 'thought most efficaciously served.' Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* (quoting *United States v. Calandra*, 414

U.S. 338, 348 (1974); *United States v. Janis*, 428 U.S. 433, 454 (1976)). In addition to deterrence, "[t]he analysis must also account for the 'substantial social costs' generated by the rule," which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Leon*, 468 U.S. at 907). Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 910).

That "cost-benefit analysis" focuses on "the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *Leon*, 468 U.S. at 909). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force' . . . ." *Id.* (quoting *Leon*, 468 U.S. at 919).

Thus, evidence obtained in reliance on a warrant will ordinarily not be suppressed, unless

> (1) the issuing magistrate was deliberately or recklessly misled by an affiant; (2) the issuing magistrate "wholly abandoned" the judicial role; (3) the affidavit was "bare bones," or "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient" that the officers could not "reasonably presume it to be valid."

*United States v. O'Neill*, 94 F.4th 531, 538 (6th Cir. 2024) (quoting *Leon*, 468 U.S. at 923). Burrus relies on the first, second, and third bases in arguing the good faith exception inapplicable.

12

    A.    <u>Reckless Misleading</u>

Burrus asserts that the affiant misled Judge Craft by implying that the undercover call to the Subject Number occurred in 2020, instead of in 2018 as was revealed at the hearing. The entirety of the paragraph containing this information is as follows:

> On 12/02/2020 at 06:50 hours, [J.O.] was found deceased by her mother, [B.C.], in the bath tub at their residence located at 8894 Lake Edge Cove East in Memphis, Shelby County, TN. The mother advised officers that [J.O.] was a recovering drug addict who preferred to use Heroin. Investigators located the victim's cellphone, drug use paraphernalia, and two plastic bags that contained 1.2 grams of Fentanyl. The victim's boyfriend has advised Sergeant Overly that [J.O.] would routinely contact her drug dealer known as "yay" at telephone number (901) 491-7846. "Yay" would sell [J.O.] varying amounts of Heroin at several public locations in the area of Perkins and Knight Arnold. Sergeant Overly researched this phone number through Memphis Police Department databases. In 2018, Sergeant Overly determined that (901) 491-7846 was in contact with a phone number used by [F.W.]. [F.W.] was identified as a half kilogram to kilogram supplier of Heroin and Fentanyl to several upper level Memphis area sources of supply. In July of 2018, OCU Investigators arrested [F.W.] with a large quantity of both Heroin (321 grams) and Methamphetamine (677.4 grams). An Undercover (UC) Memphis Police Officer called (901) 491-7846 and spoke with a male user. The UC attempted to arrange the purchase of illegal narcotics. The male user advised the UC that he would not sell to the UC because the male did not recognize the UC as a usual customer.

(ECF No. 68-1, at 3.)

The statement about the undercover call is not misleading. At best, the affidavit is ambiguous as to whether that call took place as part of the 2018 investigation or the 2020 investigation, as no date is given for the call. Because the information about the call follows from the information about the 2018 investigation, however, the most natural reading is that the call took place in 2018 (as was ultimately confirmed by Detective Atkins at the hearing). The lack of specificity as to the date of the undercover call simply cannot be said to constitute "information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," *United States v. Rice*, 478 F.3d 704, 712 (6th Cir.

13

2007) (quoting *Hython*, 443 F.3d at 484), and thus should not prevent application of the good faith exception to the exclusionary rule in this case.

  B.  <u>Abandonment of Judicial Role</u>

Burrus next argues that Judge Craft abandoned his judicial role by asking Detective Atkins for information outside of the four corners of the affidavit when he considered whether to issue the warrant. As an initial matter, Detective Atkins did not testify that he provided Judge Craft with information outside of the affidavit—he testified that they discussed the facts of the case and that he did not recall precisely what they discussed. He also testified that he did not believe that they would have discussed facts beyond what was included in the affidavit because he typically talks about only what is presented. That testimony does not establish that Judge Craft relied on additional information in signing the search warrant and instead indicates that he likely did not do so.

In any event, even if Judge Craft had considered additional information beyond the affidavit, such consideration does not trigger this exception to *Leon*. In determining whether a reviewing judge has wholly abandoned his judicial role, the Sixth Circuit has "interpreted this exception to apply if a magistrate acted as a mere 'rubber stamp' for an officer by issuing the warrant without independently examining whether probable cause exists." *United States v. Davis*, 84 F.4th 672, 683 (6th Cir. 2023) (citing, e.g., *United States v. Abdalla*, 972 F.3d 838, 847 (6th Cir. 2020)). Indeed, a judge who questions an officer about the basis for probable cause typically is not rubber stamping a warrant, as his questioning exhibits "healthy skepticism, not blanket trust." *Id.* Finally, any consideration of information outside the warrant would not be an error attributable to Detective Atkins and thus would not preclude application of the good faith exception, which "is designed to prevent police, not magistrate, misconduct." *United States v.*

14

*Frazier*, 423 F.3d 526, 538 (6th Cir. 2005) ("Because 'there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment,' any procedural errors committed by the issuing magistrate are irrelevant to the executing officer's good faith in cases where the defendant has failed to show that the magistrate abandoned his judicial role." (quoting *Leon*, 468 U.S. at 916)). The second exception also does not preclude application of the good faith exception.

    C.    <u>Bare Bones Affidavit</u>

Finally, Burrus argues that the affidavit supporting the warrant is devoid of probable cause. A warrant "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"—a "bare bones affidavit"—"shows that the officer recklessly relied on the judge's decision that probable cause existed for the warrant." *United States v. Reed*, 993 F.3d 441, 450 (6th Cir. 2021) (quoting *Leon*, 468 U.S. at 923; *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017)).

As discussed above, the affidavit in this case provides probable cause to support the search of the Subject Number and thus does not constitute a bare-bones affidavit. The information in the affidavit demonstrates that the affiant was a seasoned officer with training and experience in drug trafficking investigations. The affidavit describes an investigation into an overdose death where the victim was found in a bathtub. The victim was described by her mother as a recovering drug addict who used heroin, and fentanyl was found by investigators. The victim's boyfriend told investigators that she routinely called her drug dealer at the Subject Number and would buy varying amounts of heroin from him at various locations in a specific area. Investigators then researched the Subject Number and learned it was used to contact a known heroin and fentanyl supplier in 2018. When an undercover officer called the number, the

15

person answering the call refused to sell the caller drugs because the caller was not a usual customer. Based on this information suggesting that the Subject Number was used in drug trafficking in 2018 and was used to routinely sell drugs to J.O. in 2020, the affidavit was not so lacking in probable cause as to render the investigators' reliance on it entirely unreasonable.

In addition to his arguments regarding probable cause discussed above, Burrus relies on *United States v. Sanders*, 59 F.4th 232 (6th Cir. 2023), to support his argument against a finding of good faith. *Sanders* has been vacated, however, due to the granting of a hearing en banc, and a new opinion has not yet been issued. Regardless, the original opinion in *Sanders* does not lead to a finding that the good faith exception is inapplicable in this case. The primary issue in *Sanders* was whether the affidavit provided a sufficient nexus connecting drug trafficking with the defendant's home, where the "only direct connection" was a tip from a confidential informant. *Id.* at 238. The affidavit gave "no indication as to the veracity or reliability of the information obtained, or the factual basis underlying the CI's knowledge," and thus "'no reasonable officer would place much, if any, weight on' the CI's tip." *Id.* at 244 (quoting *United States v. Helton*, 314 F.3d 812, 821–22, 824 (6th Cir. 2003)). Here, in contrast, as discussed above, the affidavit demonstrates the reliability and basis of the information provided by the victim's boyfriend.

Because the affidavit supporting the search warrant in this case was not bare bones or lacking in probable cause, the investigators reasonably relied on its issuance in searching the records of the Subject Number. Thus, even if the probable cause stated in the affidavit is ultimately determined to be insufficient, the good faith exception should apply and preclude suppression.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 17th day of May, 2024.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver/forfeiture of objections, exceptions, and further appeal.